1   X. Alex Carpio (023141)
    alex@workinjuryaz.com
2   SNOW, CARPIO & WEEKLEY, PLC
    55 E Thomas Road, First Floor
3   Phoenix, AZ 85012
    Telephone:    602.532.0700
4   Facsimile:    602.532.0701

5   Paul L. More
    (*Pro Hac Vice* Application Forthcoming)
6   pmore@msh.law
    Sarah Grossman-Swenson
7   (*Pro Hac Vice* Application Forthcoming)
    sgs@msh.law
8   MCCRACKEN, STEMERMAN & HOLSBERRY, LLP
    595 Market Street, Suite 800
9   San Francisco, CA  94105
    Telephone:    415.597.7200
10  Facsimile:    415.597.7201

11  *Attorneys for Plaintiffs United Food*
    *& Commercial Workers Local 99*,
12  *Arizona State AFL-CIO*, and
    *James McLaughlin*

13

**IN THE UNITED STATES DISTRICT COURT**

14

**FOR THE DISTRICT OF ARIZONA**

15

| | |
|---|---|
| 16   United Food & Commercial Workers Local 99; Arizona State AFL-CIO; and James McLaughlin, | No. |
| 17 | |
| 18                    Plaintiffs, | **COMPLAINT** |
| 19        v. | |
| 20   Douglas Ducey, in his capacity as the Governor of the State of Arizona; | |
| 21   Mark Brnovich, in his capacity as the Attorney General of the State of Arizona; | |
| 22   Dale L. Schultz, in his capacity as Chair of the Industrial Commission of Arizona; | |
| 23   Joseph M. Hennelly, Jr., in his capacity as the Vice Chairman of the Industrial Commission of Arizona; Scott P. LeMarr, in | |
| 24   his capacity as Member of the Industrial Commission of Arizona; Steven J. Krenzel, | |
| 25   in his capacity as Member of the Industrial Commission of Arizona; Lisa Padgett, in her | |
| 26   capacity as the Director of the Labor Department of the Industrial Commission of | |
| 27   the State of Arizona, | |
| 28                    Defendants. | |

Plaintiffs United Food & Commercial Workers Local 99, Arizona State AFL-CIO, and James McLaughlin ("Plaintiffs"), through undersigned counsel, hereby allege as follows:

**INTRODUCTION**

1. This is a civil rights action seeking an injunction barring enforcement of the recently enacted Arizona Senate Bill 1268 ("SB 1268"), an unconstitutional and hopelessly vague law that seeks to usurp federal regulation of labor-management benefit funds, union membership rules, and union-dues collection procedures. Plaintiffs request a declaration that SB 1268 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), the National Labor Relations Act ("NLRA"), the Railway Labor Act ("RLA"), the Labor Management Relations Act ("LMRA"), and the Labor Management Reporting and Disclosure Act ("LMRDA"), and that it is unconstitutional under the First and Fourteenth Amendments to the United States Constitution, the Impairment of Contract Clause of the United States Constitution, and the analogous provisions of the Arizona Constitution. A true and correct copy of SB 1268 is attached to this complaint as Exhibit A.

2. SB 1268 purports to add new state reporting and administration obligations on employee benefit plans that are regulated exclusively by ERISA, 29 U.S.C. §§1001 et seq.:

(a) Section (A)(1)-(3) of SB 1268 purports to require "labor organizations"—an undefined term—to annually disclose to their members and their members' employers various data on benefits "revenue" and "expenditures," in a manner that makes little sense in the context of either joint labor-management benefit plans or employer-sponsored benefit plans.

(b) Section (A)(4) purports to require a "labor organization benefit plan" to use generally accepted accounting principles to account for benefit funds.

(c) Section (A)(5) purports to require employers and "labor organizations" to permit "members"—also undefined—to pick and choose between benefits offered through

a joint labor-management plan or through an "employer benefit plan," and directs employers to violate the law and their collective bargaining agreements by withholding benefit contributions owed based on the employee's selection.

(d)     Section (A)(6) purports to require "unions" to refund benefit contributions to an employee if those contributions are in "excess" of an indecipherable measure of "costs" that the "union" incurs for the benefits, or to deposit those contributions in a "defined contribution plan" of unknown sponsorship and control.

(e)     Section (A)(7) purports to prohibit a "labor organization" from accepting employers' benefits contributions for employees who have not "voluntarily joined" the labor organization, under an undefined standard.

(f)     Section (A)(8) purports to prohibit "union benefits" from being "withheld" from an "individual" without the "individual's affirmative consent," apparently requiring that all "individuals" be entitled to "union benefits" regardless of whether they qualify for them.

(g)     Section (C) purports to absolve a member or employer who is required to make benefit contributions for training and other, undefined benefits from their legal and contractual obligation to do so if a "labor organization" is "in violation" of SB 1268's requirements.

3.     ERISA sets forth comprehensive rules governing benefit-plan reporting and administration. Its provisions "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. §1144(a). ERISA preempts each of the state-law obligations that SB 1268 purports to establish.

4.     SB 1268 also seeks to rewrite the federally regulated processes by which union members may contribute, and labor unions may receive, the dues that allow labor unions to function. It also seeks to create state oversight over labor unions' associational membership rules:

(a)     Section (A)(7) of SB 1268 purports to prohibit a labor organization from accepting dues from an employee that has not "voluntarily joined the labor organization," under an undefined standard.

(b)     Section 8(A)(8) purports to regulate the terms under which "an individual may . . . be considered to be a member of a labor organization." It also purports to prohibit dues from being "withheld" from any individual without "affirmative written consent" and to prohibit "any penalty or fee" related to the employee's "abstention or resignation" from membership in a labor organization.

(c)     Section (C) purports to mandate that labor organizations "forfeit" dues to which they are entitled if an unknown decision maker considers them to be "in violation" of SB 1268's substantive requirements.

5.     Federal law governs union members' rights with respect to their membership and participation in a labor organization, the dues they pay to their union, and the processes by which union dues may be voluntarily withheld from employee paychecks. Union members' rights are governed by the NLRA, the LMRDA, 29 U.S.C. §§401 et seq., and by unions' democratic constitutions, which are interpreted exclusively under federal law. "Dues-checkoff" procedures, under which union members agree to employers' withholding union dues automatically from their pay, are governed exclusively by LMRA §302(c)(4), 29 U.S.C. §186(c)(4), and the RLA, 45 U.S.C. §152, Eleventh, subd. (b). Each of these bodies of law preempt the Arizona legislature's attempt to regulate union membership rules and dues-payment procedures.

6.     SB 1268 is invalid in other respects. It is unconstitutionally vague, failing to define key terms, apparently misconstruing the relationship between labor unions and joint labor-management benefit funds, and presenting regulated labor unions, employers, and benefit plans with inscrutable obligations. Its reporting provisions violate the First Amendment's prohibition against compelled speech by requiring labor organizations to make misleading statements about the relationship between benefit-plan contributions and the costs of providing benefits to individual participants. Its attempt to regulate the terms

under which private organizations may admit and recognize members treads on core associational rights. And it interferes with existing contractual relationships, including existing collective bargaining agreements, trust agreements, dues-checkoff agreements, and union constitutions.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 42 U.S.C. §1988, 28 U.S.C. §§1331 and 1343, based on 42 U.S.C. §1983 and the federal constitutional questions and interpretation of federal statutes that this action raises. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§2201(a) and 2202.

8. This Court has supplemental jurisdiction over state-law claims in this action pursuant to 29 U.S.C. §1367, as all such claims arise from a common nucleus of facts as the federal claims.

9. Venue is proper in the District of Arizona because the events and conduct complained of herein all occurred in this District.

## PARTIES

10. Plaintiff UNITED FOOD & COMMERCIAL WORKERS LOCAL 99 ("UFCW Local 99") is the largest private-sector union in Arizona, representing more than 22,000 grocery workers, food processors, farm growers, and other employees throughout the State. UFCW Local 99 relies on the dues contributed by its members to fund its representation activities and political work. Through its collective bargaining agreements with employers, UFCW Local 99 jointly sponsors labor-management benefit funds that provide health insurance, pensions, and other benefits to represented workers.

11. Plaintiff ARIZONA STATE AFL-CIO is an association of labor unions in Arizona, and one of nearly 500 state and local labor councils of the AFL-CIO. Together, Arizona State AFL-CIO's affiliated labor unions represent some 150,000 working people in Arizona. SB 1268 regulates Plaintiff Arizona State AFL-CIO's affiliates that represent workers in the private sector, including in bargaining units regulated by the NLRA and by the RLA. These affiliated labor unions rely on the dues contributed by their members to

fund their activities, and collectively bargain for benefit plans that provide health insurance, pensions, and other benefits to workers that they represent. Plaintiff Arizona State AFL-CIO has associational standing in this matter because its labor-union members have standing to sue in their own right, the interests at stake in this litigation are germane to Plaintiff Arizona State AFL-CIO's purpose, and neither the claims asserted in this action nor the injunctive or declaratory relief the Plaintiff Arizona State AFL-CIO seeks requires the participation of its individual labor-union affiliates. Plaintiff UFCW Local 99 and Plaintiff Arizona State AFL-CIO's affiliated labor unions representing private-sector workers are referred to herein as the "Plaintiff Unions."

12. Plaintiff JAMES McLAUGHLIN is the President of UFCW Local 99 and the President of the Arizona State AFL-CIO. He is also a Union Trustee of the United Food and Commercial Workers & Employers Arizona Health and Welfare Trust.

13. Defendant DOUG DUCEY is the Governor of Arizona and is named as a Defendant in that capacity. Governor Ducey is responsible for carrying out laws enacted by the Legislature, including enforcement of SB 1268 through his oversight of the State's departments, including without limitation the Industrial Commission of Arizona ("Industrial Commission") and its Labor Department.

14. Defendant MARK BRNOVICH is the Attorney General of the State of Arizona and is named as a Defendant in that capacity. Attorney General Brnovich is responsible for enforcing SB 1268 through his duty as legal advisor to the departments of the State, including without limitation the Industrial Commission and its Labor Department, and through his power to settle or compromise any action or claim brought by the State or any department of the State, including without limitation the Industrial Commission and its Labor Department.

15. Defendant DALE L. SCHULTZ, is the Chairman of the Industrial Commission and is named as a Defendant in that capacity. The Industrial Commission is responsible for enforcing SB 1268, including without limitation through its authority to "[a]dminister and enforce all laws for the protection of life, health, safety and welfare of

employees in every case and under every law when such duty is not specifically delegated to any other board or officer." Ariz. Rev. Stat. §23-107(A). Defendant JOSEPH M. HENNELLY, JR. is the Vice Chairman of the Industrial Commission and is named as a Defendant in that capacity. Defendants SCOTT P. LeMARR and STEVEN J. KRENZEL are members of the Industrial Commission and are named as Defendants in that capacity. Defendant LISA PADGETT is the Director of the Labor Department of the Industrial Commission and is named as a Defendant in that capacity. As Director of the Labor Department, Defendant Padgett is responsible for enforcing SB 1268 through, without limitation, her duty to "administer the policies, powers and duties of the commission." Ariz. Rev. Stat. §23-108.01(A).

## FACTUAL AND LEGAL ALLEGATIONS

### *SB 1268's Unconstitutional Regulation of Benefit Plan Reporting*

16. Plaintiff UFCW Local 99 is party to collective bargaining agreements with retail grocery stores, food processors, and other private-sector employers in the State. These collective bargaining agreements require employers to make contributions to joint labor-management (or "Taft-Hartley") benefit funds, including the United Food and Commercial Workers & Employers Arizona Health and Welfare Trust and the Desert States Employers & United Food & Commercial Workers Unions Pension Plan. These contractually required contributions are made by employers on a per-employee, per-hour basis to the Taft-Hartley benefit funds, and not to UFCW Local 99. Plaintiff UFCW Local 99 is party to trust agreements with participating employers governing the administration of these Taft-Hartley benefit funds.

17. Plaintiff Arizona State AFL-CIO's affiliated labor unions are parties to collective bargaining agreements with private-sector employers in the State. These collective bargaining agreements require employers to make contributions to joint labor-management and employer-sponsored benefit funds, providing health insurance, pensions, vacation pay, training, and other benefits to represented workers. The collective bargaining agreements require that the employers' contractually required contributions are paid to

Taft-Hartley benefit plans or to employer-sponsored plans, not to the unions who are parties to the collective bargaining agreements. In several instances, affiliates of Plaintiff Arizona State AFL-CIO have collectively bargained for benefit plans that are funded by union dues payments to the labor union, which administers the plan. Affiliates of Plaintiff Arizona State AFL-CIO or their representatives are parties to trust agreements with participating employers governing the administration of their joint labor-management, Taft-Hartley benefit plans.

18.     Under the Taft-Hartley Act, LMRA §302, 29 U.S.C. §186(a) and (b)(1), labor unions are prohibited from receiving any "any money or other thing of value" from an employer, and employers are prohibited from paying "any money or other thing of value" to a labor union. LMRA §§302(c)(5)-(8), 29 U.S.C. §§186(c)(5)-(8), create exceptions under which an employer may make contributions of money to a trust fund sponsored by a labor union to pay for health insurance, pensions, other forms of industrial insurance, pooled vacation, holiday, severance, training, educational scholarships, housing, or legal services, but only if employees and employers are equally represented in the fund's administration. A labor union official involved in receiving the payment of benefit monies from an employer outside of the framework set forth in LMRA §§302(c)(5)-(8), 29 §§186(c)(5)-(8), is guilty of a felony. As a result, Plaintiff Unions do not receive contributions from employers to pay for health insurance, pensions, vacation pay, training, or other benefits.

19.     The Taft-Hartley benefit plans sponsored by Plaintiff Unions and the employer-sponsored plans that they have negotiated, as well as the few union-sponsored plans funded by union dues, are "employee welfare benefit plans" and "employee pension benefit plans" within the meaning of ERISA, 29 U.S.C. §1002(1), (2).

20.     ERISA sets forth comprehensive reporting and disclosure requirements for regulated employee welfare benefit plans and employee pension benefit plans. ERISA plans must present participants with a plan description explaining, among other things, the plan's eligibility requirements and claims processing procedures. 29 U.S.C. §§1021(a)(1),

1022, & 2024(b)(1). ERISA also requires covered benefit funds to file an annual report with the Secretary of Labor that includes a financial statement listing assets and liabilities for the previous year and, further, receipts and disbursements of funds. 29 U.S.C. §§1021(b), 1023(b)(1), 1023(b)(3)(A)-(B), & 1024(a). Covered benefit plans must provide the information on assets and liabilities as well as receipts and disbursements to plan participants annually. 29 U.S.C. §§1021(a)(2), 1023(b)(3)(A)-(B), & 1024(b)(3).

21. The Secretary of Labor has authority to establish additional reporting and disclosure requirements for ERISA plans, including authority to "require[e] any information or data from any [plan] where he finds such data or information is necessary to carry out the purposes of" the statute. 29 U.S.C. §1024(a)(2)(B). Violation of any of these various requirements may result in both civil and criminal liability. See 29 U.S.C. §§1131-1132.

22. SB 1268 purports to subject Plaintiff Unions' ERISA-governed plans to additional, state-law reporting and disclosure requirements.

23. Section 23-1421(A)(1) requires that a "labor organization"—a term that SB 1268 does not define—must annually provide to its "members" (again, undefined) and its members' employers a consolidated statement containing: (a) the "labor organization's total revenue and expenditures for each benefit category within this state and nationally"; (b) "the price of each unit collected" (a concept that is undefined and inscrutable, since the terms "price" and "unit" are unclear); and (c) "the cost of each benefit provided to the member," listed as the "monthly premium cost for insurance products" or "another formula for noninsurance benefits"; (d) "a list of any payments that the labor organization makes during the year for each benefit category"; and (e) "a reconciliation and explanation of any differences between the "total revenue and expenditures for each benefit category" and "the payments that the labor organization makes during the year for each benefit category."

24. Taft-Hartley benefit funds such as those sponsored by Plaintiff UFCW Local 99 and by many of Plaintiff Arizona State AFL-CIO's affiliated labor unions are multi-employer, pooled risk funds. Unlike benefit plans that are sponsored and administered by

one employer for their own employees, Taft-Hartley benefit funds are created for the benefit of represented employees working for many employers. Because multiple employers contribute to Taft-Hartley funds, the costs of providing benefits are shared and the risks are pooled. The cost of providing benefits under a Taft-Hartley benefit fund is collective, and is not structured on an individual-employee basis.

25. Employer-sponsored plans that are funded through employer contributions under Plaintiff Unions' collective bargaining agreements also do not generally calculate costs on a per-employee basis, because they provide benefits for the entire bargaining unit.

26. Similarly, the employer contributions towards benefits required under Plaintiff Unions' collective bargaining agreements are not structured to cover the costs of providing benefits on a per-employee basis. While collectively bargained employer benefit contributions are generally a function of employees' hours worked (or the hours paid) for administrative simplicity, contribution amounts go toward funding the benefits of all employees (and their beneficiaries) of all of the employers that participate in the fund. In the case of health, pension, and certain other funds, employer contributions not only cover the current cost of providing benefits to the employees of all participating employers, but also fund reserve holdings necessary to ensure the payment of future benefits.

27. Notwithstanding the fact that the benefit plans that SB 1268 purports to regulate structure employer contributions and the costs of benefits on a collective rather than individual-employee basis, SB 1268 would compel "labor organizations" to issue highly misleading annual "disclosures" to their members that attempt to compare the amount of hourly contributions made by an employer based on the particular member's hours with the undefined "true cost" of the benefit provided on the member's behalf. This compelled disclosure requires an assumption that the amount of employer contributions for a particular member's hours should be no more than the "true cost" of providing benefits to that particular member, as SB 1268 requires the "labor organization" to "reconcil[e]" any discrepancy.

28.     SB 1268 would require each "labor organization" to post this compelled, misleading disclosure on the labor organization's "publicly viewable website" or to provide copies annually to each member and each member's employer (even though the member's employer is itself jointly responsible for managing a Taft-Hartley benefit plan and administers its own employer-sponsored plan).

### SB 1268's Unconstitutional Regulation of ERISA Trustees' Fiduciary Duties

29.     ERISA was adopted, in large part, to define and standardize the duties of fiduciaries responsible for the administration of covered benefit plans.  ERISA contains extensive regulations governing fiduciary duties in plan administration.  *See* 29 U.S.C. Part 4, §§ 1101-1114.

30.     SB 1268 purports to add to ERISA's comprehensive regulation of fiduciary duties by creating an inscrutable, state-law requirement that "a labor organization that collects benefit monies . . . is subject to similar fiduciary guidelines as required by [*sic*] employers or third-party administrators providing benefits to employees in this state." (SB 1268, §23-1421(A).)

31.     None of the key terms of this purported fiduciary obligation—"labor organization," "similar fiduciary guidelines," "third party administrators"—is defined. Since employers participate in Taft-Hartley benefit plans in the same way as labor unions do, and those benefit plans are often administered by contracted third-parties, and all Taft-Hartley benefit plans are subject to ERISA-governed fiduciary duties, it is entirely unclear what additional fiduciary "guidelines" SB 1268 would require of "labor organizations." Moreover, since labor unions, including Plaintiff Unions, also negotiate for employer contributions to "employer benefit plans," it is unclear how the additional fiduciary obligations in SB 1268 would apply to "labor organizations" that have negotiated such plans.

32.     In addition, SB 1268 purports to require "a labor organization benefit plan" (another undefined term) to "use generally accepted accounting principles to account for benefit funds in a similar manner as required by an employer benefit plan."  A Taft-Hartley

benefit plan is both a "labor organization benefit plan" and an "employer benefit plan." Plaintiff Unions have also negotiated employer-sponsored benefit plans, and it is not clear whether such plans become "labor organization benefit plans" by virtue of the fact that they have been collectively bargained. Both types of plans are regulated exclusively by ERISA, which already requires that the plan be audited using generally accepted accounting principles, see 29 U.S.C. §1023(a)(3), so SB 1268's additional requirements are incomprehensible, redundant, and preempted.

### *SB 1268's Unconstitutional Regulation of Benefit Plan Design*

33.     ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways[.]" *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 480 (2020). A state law that "'bind[s] plan administrators to [a] particular choice'" concerning the substance of plan administration or benefits "relate[s] to" an employee benefit plan and is preempted by ERISA. *Ibid.* (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 659 (1995)); 29 U.S.C. §1144(a).

34.     Furthermore, the NLRA requires employers and unions to bargain over represented workers' terms and conditions of employment, and this "duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract" except after following specific timing and notice requirements and bargaining in good faith to impasse. 29 U.S.C. §§158(a)(5), (b)(3), (d). An employer's unilateral changes to terms and conditions of employment violates these obligations. 29 U.S.C. §158(a)(5); *NLRB v. Katz*, 369 U.S. 736 (1962). The obligation to bargain in good faith requires "at a minimum recognition that the statutory representative is the one with whom [the employer] must deal in conducting bargaining negotiations, and that it can no longer bargain directly or indirectly with the employees." *NLRB v. Insurance Agents (Prudential Insurance Co.)*, 361 U.S. 477, 484-85 (1960). Similar obligations apply under the RLA. 45 U.S.C. §152.

35. Yet, SB 1268 purports to:

(a)　require that employers and collectively bargained benefit plans give "a member of a labor organization" the right to opt-out of "the benefits offered by the labor organization" and "ultimate discretion regarding which benefits the member chooses" (SB 1268, §23-1421(A)(5));

(b)　require a unionized employer to allow "members of a labor organization" to "obtain benefits from the member's employer" rather than through the benefit plan that the employer and the union have negotiated for the member (SB 1268, §23-1421(A)(5)(a));

(c)　allow a unionized employer to withhold benefit-fund contributions that it has negotiated with the labor union if the "member" chooses to "obtain benefits from the employer" (SB 1268, §23-1421(A)(5)(a));

(d)　require a unionized employer to withhold benefit contributions that it has negotiated with the relevant labor union if the member chooses "to obtain benefits from a person outside of the employment relationship" and to instead "forward the monies" to the "employee" or its chosen "benefit provider" "as agreed to by employee and employer" (SB 1268, §23-1421(A)(5)(b));

(e)　require a "union" that receives "fringe benefit contributions . . . that are in excess of the costs that the union incurs with respect to that fringe benefit" to refund those contributions to the "employee" or deposit them in a "defined contribution plan" of unknown sponsorship, administration, or design (SB 1268, §23-1421(A)(6));

(f)　prohibit a "labor organization" from accepting "benefits contributions" for "employees that have not voluntarily joined the labor organization" under an undefined standard (SB 1268, §23-1421(A)(7));

(g)　prohibit an employer, union, or benefit plan from having "union benefits withheld from [an] individual . . . without the individual's affirmative written consent," thus apparently requiring employers, unions, and benefit plans to extend all "union benefits" to all employees—regardless of whether the employee qualifies for them—unless

the employee gives written consent to being denied the benefits (SB 1268, §23-1421(A)(8));

(h)     absolve a "member or employer" who is "otherwise obligated to contribute benefit monies" for training and undefined, "other" benefits of any obligation to make those contributions "during any time that the labor organization is in violation of" SB 1268's substantive requirements" (SB 1268, §23-1421(C)); and

(i)     mandate that a "labor organization" that "is in violation"—pursuant to an undefined standard—for more than thirty days "forfeits the labor organization's claim on the benefit monies that the member or employer was obligated to contribute" (SB 1268, §23-1421(C)).

36.     SB 1268 thus purports to upend the design and funding of collectively bargained, ERISA-governed arrangements for the provision of health care, pensions, training, and other benefits to unionized Arizona workers, including the benefit plans negotiated by Plaintiff Unions.

### *SB 1268's Unconstitutional Regulation of Collectively Bargained Employer Contributions*

37.     Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. §1145.

38.     Plaintiff UFCW Local 99 and most of Plaintiff Arizona State AFL-CIO's affiliated labor unions are parties to collective bargaining agreements requiring employers to make contributions to joint labor-management benefit plans, and when such agreements expire, Plaintiff UFCW Local 99 and Plaintiff Arizona State AFL-CIO's constituent labor unions bargain collectively with employers over new agreements providing for employer contributions to Taft-Hartley benefits plans.   Plaintiff Unions also negotiate with employers over employer contributions to employer-sponsored benefit plans.   The

negotiation and enforcement of such collective bargaining agreements and collectively bargained employer contributions are governed exclusively by ERISA, the NLRA, the RLA, and LMRA §301, 29 U.S.C. §185.

39. Notwithstanding this exclusive federal law, SB 1268 purports to allow, and in some cases command, employers to withhold benefit-fund contributions that they are obligated to make under their collective bargaining agreements with Plaintiff Unions. Specifically:

(a) SB 1268, §23-1421(A)(5)(a) permits employers to "withhold payment" of benefit contributions if a "member" elects "to obtain benefits from the member's employer";

(b) SB 1268, §23-1421(A)(5)(b) requires employers to "withhold payment" of benefit contributions if the "member" elects "to obtain benefits from a person outside of the employment relationship"; and

(c) SB 1268, §23-1421(C) absolves employers from any obligation to make benefits contributions for "training" and undefined, "other" benefits "during any time that the labor organization is in violation of" SB 1268's substantive provisions, and permanently if the labor organization "is in violation of" SB 1268's substantive provisions "for more than thirty days."

### SB 1268's Unconstitutional Regulation of Labor Union Dues and Membership

40. Plaintiff Unions fund their representation of Arizona workers, as well as their political work, through the voluntary payment of dues by their members.

41. Membership in the Plaintiff Unions is chosen voluntarily, as Arizona's "Right to Work" laws bar anyone from being denied employment for refusal to join a union. Ariz. Const. Art. 25; A.R.S. §§ 23-1301 *et seq*.

42. Nearly all members of Plaintiff Unions contribute their regular dues by having them deducted from their paycheck and remitted to the union by their employer, an administrative convenience that helps the unions to keep dues amounts lower and avoid the necessity of collecting delinquent dues. The Plaintiff Unions' collective bargaining

agreements contain dues-checkoff clauses, which require signatory employers to remit dues to the unions.

43.  Members of the Plaintiff Unions have entered into "dues-checkoff authorization agreements" with their employers, directing the employer to deduct union dues and fees regularly from the employee's paycheck and to remit those funds to the applicable union.  Plaintiff Unions and unionized employers have bargained for standard terms for such checkoff authorizations, consistent with federal law.  For administrative convenience, such checkoffs are generally irrevocable for a one-year period and have time windows during which they may be revoked.

44.  LMRA §302(c)(4) imposes three limits on dues-checkoff authorizations: the authorization must be (a) individual for each employee; (b) in writing; and (c) irrevocable for no longer than one year.  The RLA, 45 U.S.C. §152, Eleventh, contains similar limits. Federal law preempts any attempt by states to impose additional regulations on dues-checkoff authorizations.  *Sea Pak v. Indus. Tech & Prof. Employees, Div. of Nat'l Maritime Union*, 400 U.S. 985 (1971); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969).

45.  The LMRDA regulates labor unions' collection of dues, including Plaintiff UFCW Local 99's and Plaintiff Arizona State AFL-CIO's constituent labor unions' collection of dues.  Section 101(a)(3) of the LMRDA, 29 U.S.C. §411(a)(3), prohibits an increase in dues, or the levy of a general or special assessment without "(i) a majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot."  Section 101(a)(5) contains safeguards against disciplinary action against members, including notice and a "full and fair hearing," but expressly exempts the "non-payment of dues" from these requirements.  29 U.S.C. §411(a)(5).

46.  LMRDA Section 201(a)(4) requires that labor unions "shall adopt a constitution and bylaws and shall file a copy thereof with the Secretary, together with a

report, . . . containing . . . the regular dues or fees or other periodic payments required to remain a member of the reporting labor organization." 29 U.S.C. §431(a) & (a)(4). Plaintiff Unions are parties to constitutions and bylaws setting forth the obligation of members to pay regular dues, fees, and assessments and the procedures for changing dues rates and assessments. Such constitutions are contracts between the local unions and their international bodies, and are enforceable exclusively under the federal common law established under LMRA §301, 29 U.S.C. §185, and the RLA, 45 U.S.C. §153(i).

47.     Section 8(b)(1)(A) of the NLRA provides that a union commits an unfair labor practice if it "restrain[s] or coerce[s] employees in the exercise" of their Section 7 rights, but provides that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U.S.C. 158(b)(1)(A). The National Labor Relations Board ("NLRB") has held that Section 8(b)(1)(A) prohibits unions from placing certain substantive restrictions on the right to resign from union membership. *See Pattern Makers' League v. NLRB*, 473 U.S. 95, 100–01 (1985).

48.     Plaintiff Unions each have bylaws and a constitution to which those choosing to join the unions are bound, which provide for the holding of open membership meetings, the regular election of officers, and internal administrative remedies for members.

49.     Notwithstanding the exclusive regulation of dues-checkoff set forth in LMRA §302(c)(4), 29 U.S.C. §186(c)(4), and the RLA, 45 U.S.C. §152, Eleventh; the exclusive federal procedure for enforcing union constitutions under LMRA §301, 29 U.S.C. §185, and the RLA, 45 U.S.C. §153(i); and the primary jurisdiction of the NLRB to adjudicate restrictions on members' rights to resign from union membership, SB 1268:

(a)     prohibits a "labor organization" from "accept[ing] dues . . . for employees that have not voluntarily joined the labor organization" under an undefined, state-law standard (SB 1268, §23-1421(A)(7));

(b)     provides "any resident of the state" with a state-law cause of action against a "labor organization" "for monies that are paid to a labor organization on behalf of the

resident" without "the resident's consent" under an unspecified, state-law standard of "consent" (SB 1268, §23-1421(A)(7));

(c)     prohibits employers from withholding "any union dues" without the individual's "affirmative written consent" under an unspecified state-law standard (SB 1268, §23-1421(A)(8));

(d)     prohibits an employee from "pay[ing] any penalty or fee related to" the employee's "abstention or resignation" from labor organization membership under an undefined state-law standard (SB 1268, §23-1421(A)(7)); and

(e)     prohibits "an individual" from "be[ing] considered to be a member of a labor organization"—under an undefined state-law standard—"without the individual's affirmative written consent" (SB 1268, §23-1421(A)(8)); and

(f)     permits a member to withhold union dues during any time that the labor organization is "in violation" of SB 1268's substantive provisions and to renege on its obligation to pay union dues if the labor organization is "in violation" of SB 1268's substantive provisions for more than 30 days (SB 1268, §23-1421(C)).

50.     SB 1268 will go into effect 90 days after the Arizona Legislature adjourns *sine die*.

51.     Absent injunctive relief, unionized Arizona employers, including Arizona employers in collective bargaining relationships with Plaintiff Unions will be subject to conflicting legal standards, required to remit benefit contributions to benefit plans under federal law, their Taft-Hartley trust agreements, and their collective bargaining agreements, but prohibited from doing so by SB 1268.

52.     Absent injunctive relief, some union members, including some members of Plaintiff Unions, will fail to remit dues they are obligated to pay to their union, based on the illusion that SB 1268 abrogates their obligation to do so. This may require Plaintiff Unions to bring collection actions against their members, impacting Plaintiff Unions' relationships with their members in fundamental ways. Any such reduction in dues, even

if only temporary, will also undermine Plaintiff Unions' ability to represent workers under their collective bargaining agreements and to participate fully in the political sphere.

53.     Absent injunctive relief, Plaintiff Unions and the benefit plans they have collectively bargained will be required to make fundamental administrative changes or risk violating SB 1268, impacting the plans' ability to provide health insurance, pensions, and other benefits to their participants.

54.     Absent injunctive relief, Plaintiff UFCW Local 99 and Plaintiff Arizona State AFL-CIO's affiliated labor unions or their benefit plans will be compelled to make the misleading "disclosure" mandated by SB 1268.

55.     The harms described in paragraphs 50-53, among others that will result from SB 1268, are irreparable and cannot be adequately remedied at law.

**FIRST CAUSE OF ACTION**
**(Preemption by the Employee Retirement Income Security Act of 1974,**
**29 U.S.C. §1144(a))**
**("Reference To" Preemption)**

56.     Plaintiffs incorporate paragraphs 1-55 of this complaint by reference as if fully set forth herein.

57.     ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. §1144(a). A state law "relates to" an employee benefit plan if it "has a ' " 'reference to'"' ERISA plans" or where it "has an impermissible 'connection with' ERISA plans." *Gobeille v. Liberty Mutual Ins. Co*., 577 U.S. 312, 319-20 (2016) (internal citations omitted).

58.     A state law has "reference to" an ERISA plan ""[w]here [the] State law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation[.]"' *Id*. at 20 (quoting *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997)).

59.     SB 1268, §§23-1421(A), (C), and (D) act immediately and exclusively upon ERISA plans, including Plaintiff Unions' joint labor-management and collectively bargained employer-sponsored and union-sponsored plans. These sections of SB 1268

purport to regulate the administration, reporting, and fiduciary responsibility over "health and welfare," "pension," "vacation, sick, or holiday," "training" and "other" benefits paid for through employer contributions to "labor organizations." Each of these categories of benefit plans is governed exclusively by ERISA.

60. Even if SB 1268 did not act immediately and exclusively on ERISA plans, the existence of such plans is essential to SB 1268, §§23-1421(A), (C), and (D)'s operation. These sections purport to regulate employer obligations to contribute to such plans, "member" rights to opt-out of coverage of such plans (and to receive employer contributions otherwise due to such plans), standards for financial auditing of such plans, and disclosure requirements for such plans.

61. SB 1268, §§23-1421(A), (C), and (D) are each invalid under the "reference to" prong of ERISA preemption.

## SECOND CAUSE OF ACTION
### (Preemption by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1144(a))
### ("Connection With" Preemption)

62. Plaintiffs incorporate paragraphs 1-61 of this complaint by reference as if fully set forth herein.

63. A state law has an impermissible "connection with" an ERISA plan if it "governs . . . a central matter of plan administration" or "interferes with national uniform plan administration." *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001).

64. SB 1268, §23-1421(A) is preempted under the "connection with" prong of ERISA preemption because it purports to establish state-law fiduciary duties governing "labor organization" benefit plans that differ from those established by ERISA.

65. SB 1268, §§23-1421(A)(1)-(3) are preempted under the "connection with" prong of ERISA preemption because they purport to impose state-law reporting requirements on ERISA-governed benefit plans, despite the Supreme Court's recognition that "reporting, disclosure, and recordkeeping are central to, and an essential part of, the

uniform system of plan administration contemplated by ERISA." *Gobeille*, 577 U.S. at 323.

66.     SB 1268, §23-1421(A)(4) is preempted under the "connection with" prong of ERISA preemption because it purports to require "labor organization benefit plans" to use generally accepted accounting principles in the administration of ERISA-governed plans, something governed exclusively (and already required) by ERISA.   29 U.S.C. §1023(a)(3).

67.     SB 1268, §23-1421(A)(5) is preempted under the "connection with" prong of ERISA preemption because it requires ERISA-governed benefit plans—including Taft-Hartley benefit plans, employer-sponsored benefit plans, and union-sponsored benefit plans—to structure their benefits and financing to permit individual participants to "opt-out" of coverage under a collectively bargained plan and "obtain benefits from the member's employer."  Section (A)(5) is also preempted under the "connection with" prong because it mandates that employers withhold contributions to ERISA-governed plans required by collective bargaining agreements if an ERISA plan participant elects coverage other than through the collectively bargained plan, notwithstanding employers' contractual and legal obligation to make those contributions.  29 U.S.C. §1145.

68.     SB 1268, §23-1421(A)(6) is preempted under the "connection with" prong of ERISA preemption because it mandates that "a union" either refund "excess" benefit contributions that it (or, presumably, the benefit plan that it sponsors) receives to the employee or deposit them in a "defined contribution plan on the employee's behalf," thus intruding directly into the administration of ERISA-governed plans and, in practical effect, requiring the establishment and administration of alternative, ERISA-governed "defined-contribution benefit plans."

69.     SB 1268, §23-1421(A)(7)-(8), and (C) are preempted under the "connection with" prong of ERISA preemption because they purport to absolve employers from their contractual and legal obligations to make contributions to ERISA-governed plans under

their collective bargaining agreements, including their collective bargaining agreements with Plaintiff Unions.

70.     SB 1268, §23-1421(A)(8) is additionally preempted under the "connection with" prong of ERISA preemption because it purports to prohibit ERISA-governed plans from "withholding" any "union benefits" from any "individual" without that individual's "affirmative written consent," thus "forc[ing] an ERISA plan to adopt a certain scheme of substantive coverage." *Travelers*, 514 U.S. at 668.

71.     SB 1268, §§23-1421(A)(1)-(8), (C), and (D) are each invalid under the "connection with" prong of ERISA preemption.

## THIRD CAUSE OF ACTION
### (Preemption by the National Labor Relations Act and Railway Labor Act)

72.     Plaintiffs incorporate paragraphs 1-71 of this complaint by reference as if fully set forth herein.

73.     The NLRA preserves the primary jurisdiction of the NLRB by prohibiting states from regulating activities that are at least arguably protected by §7 of the NLRA or arguably prohibited by §8 of that statute. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247 (1959). *Garmon* preemption "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the [NLRA]." *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986).

74.     The RLA establishes imposes a duty on employers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ."  45 U.S.C. §152.  It also creates a system for dispute resolution for grievances arising from collective bargaining agreements. The RLA establishes a mandatory arbitral mechanism to handle disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. §153(i).  The RLA prohibits employers from making unilateral changes in covered employees' terms and conditions of employment unless the

RLA's major dispute resolution mechanisms have been exhausted, and preempts state laws that frustrate the purpose of the RLA. *Bhd. of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969).

75.     SB 1268, §§23-1421(A)(5), (8), and (C) require that employers unilaterally discontinue making collectively bargained benefit contributions at the election of individual employees, which would inarguably violate Section 8(a)(5) of the NLRA, 29 U.S.C. §158(a)(5). These provisions are therefore *Garmon* preempted. They also conflict with and are preempted by the RLA.

76.     SB 1268 §§23-1421(A)(7) dictates that employers unilaterally discontinue withholding dues pursuant to collective bargaining agreements and dues-checkoff authorizations, which would inarguably violate Section 8(a)(5) of the NLRA, 29 U.S.C. §158(a)(5). It also conflicts with and is preempted by the RLA.

77.     SB 1268, §23-1421(A)(7) dictates that "labor organizations" (including, presumably, their benefit plans) unilaterally refuse to "accept" benefits contributions for bargaining-unit "employees that have not voluntarily joined the labor organization," notwithstanding the fact that employers have bargained to make such contributions and such contributions are necessary to ensure the benefits of all employees and plan participants. SB 1268 therefore requires that labor organizations take unilateral action that would arguably violate Section 8(b)(3) of the NLRA, 29 U.S.C. §158(b)(3), which prohibits labor unions from "refus[ing] to bargain collectively with an employer." This section of SB 1268 is therefore *Garmon* preempted. This section also conflicts with and is preempted by the RLA. Moreover, forcing labor organizations to "refuse to accept" benefit contributions on behalf of employees who have not decided to become union members suggests that unions, employers, and benefit plans are prohibited from providing benefits to those who have chosen, pursuant to Arizona's "Right to Work" law, not to join the union.

78.     SB 1268 §23-1421(A)(8) prohibits labor unions from establishing "any penalty or fee related to the employee's abstention or resignation from labor organization membership." Section 8(b)(1)(A) of the NLRA provides that a union commits an unfair

labor practice if it "restrain[s] or coerce[s] employees in the exercise" of their Section 7 rights, but provides that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U.S.C. §158(b)(1)(A). By purporting to create state-law causes of action against unions that impose penalties for resignations and abstentions from membership, including resignations based on a member's decision not to engage in concerted activities, SB 1268 §(A)(8) therefore regulates conduct that is both "arguably prohibited by" Section 8 of the NLRA and "arguably protected by" Section 7 of the NLRA, and is therefore *Garmon* preempted.

## FOURTH CAUSE OF ACTION
### (Preemption by the Labor Management Relations Act, 29 U.S.C. §§185 & 186, and RLA, 45 U.S.C. §152)

79. Plaintiffs incorporate paragraphs 1-78 of this complaint by reference as if fully set forth herein.

80. LMRA §302(c)(4), 29 U.S.C. §186(c)(4) sets forth three limits on dues-checkoff authorizations: that they must be (a) individual for each employee, (b) in writing; and (c) irrevocable for no longer than one year. The RLA, 45 U.S.C. §152, Eleventh, contains similar limitations.

81. SB 1286, §23-1421(A)(7) purports to add additional, state-law limitations on dues-checkoff authorizations, by requiring that a "labor organization" refuse to accept dues remitted pursuant to such authorizations unless the employee "voluntarily joined the labor organization" under an undefined standard. SB 1286, §23-1421(A)(8) purports to prohibit an employer from withholding dues pursuant to a valid dues-checkoff authorization if the employee does not give "affirmative written consent" under an undefined state-law standard. Together, these sections of SB 1268 purport to require that dues checkoff authorizations be terminable at will by an employee and that affirmative written consent be obtained under state-law rules other than those set forth in LMRA §302(c)(4) and the RLA, 45 U.S.C. §152, Eleventh.

82.     SB 1268, §23-1421(A)(7) purports to give "resident[s] of this State" standing to bring a state-court action against a labor organization for its receipt of dues pursuant to a valid dues checkoff authorization and collective bargaining agreement dues-checkoff provision. LMRA §301, 29 U.S.C. §185, is the exclusive mechanism for allegations that a collective bargaining agreement's dues-checkoff provision has been violated.

83.     SB 1268, §§23-1421(A)(7) and (8) are preempted by LMRA §302, 29 U.S.C. §186(c)(4) and by the RLA, 45 U.S.C. §152, Eleventh. *Sea Pak v. Indus., Tech., & Prof. Employees, Div. of Nat'l Maritime Union*, 400 U.S. 985 (1971). The State of Arizona has previously attempted to regulate dues-checkoff procedures, and the federal court has explained that doing so is preempted. *United Food & Commercial Workers Local 99 v. Bennett*, 934 F.Supp.1167, 1180, 1182 (D. Ariz. 2013).

84.     These provisions are also preempted by LMRA §301, 29 U.S.C. §185, which preempts state law causes of action that are founded directly on rights created by contracts between labor organizations, and also claims that are substantially dependent on analysis of such contracts. Union constitutions, including those of the Plaintiff Unions, are contracts enforceable under LMRA §301, 29 U.S.C. §185. *Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93 (1991). Those constitutions set forth rules for the payment of dues by members, including, in some cases, fines and penalties for members that engage in specified conduct. SB 1268, §§23-1421(A)(7) and (8) are preempted by LMRA §301, 29 U.S.C. §185 because the rights contained in them are founded directly on the union constitutions that set forth members' dues obligations and because adjudication of claims under these provisions of SB 1268 would require interpretation of those constitutions. They are also preempted by LMRA §301 to the extent they purport to provide a forum other than that provided by LMRA §301 for the vindication of rights under these union constitutions.

85.     SB 1268, §23-1421(A)(7) is also preempted by the RLA because it purports to extend Arizona's "Right to Work" laws, Ariz. Const. Art. 25; A.R.S. §§ 23-1301 *et seq.*, to RLA-covered unions and workers. Section 14(b) of the LMRA, 29 U.S.C. §164(b),

which is the basis for Arizona's "Right to Work" laws barring union security clauses in collective bargaining agreements, does not apply to RLA-covered unions and workers, which are governed exclusively by the RLA, 45 U.S.C. §152, Eleventh.

**FIFTH CAUSE OF ACTION**
**(Preemption by the Labor Management Reporting and Disclosure Act,**
**29 U.S.C. §501)**

86.     Plaintiffs incorporate paragraphs 1-85 of this complaint by reference as if fully set forth herein.

87.     LMRDA §501, 29 U.S.C. §501(a) sets forth the fiduciary duties of labor officials, including the obligation of "each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder[.]"  The LMRDA requires aggrieved union members to pursue their claims in federal district court, and only after they have notified the governing body of the labor organization, providing notice of the alleged violations and an opportunity to address them.  29 U.S.C. §501(b).

88.     SB 1268, §§23-1421(A) purports to establish new, state-law fiduciary standards for labor unions' collection and administration of dues, requiring "labor organizations" to abide by "similar fiduciary guidelines" in these activities as those followed by "employers or third-party administrators" that "provide[s] benefits to employees in this State."  SB 1268, §§23-1421(A) conflicts with, and is preempted by, Section 501 of the LMRDA.

**SIXTH CAUSE OF ACTION**
**(First and Fourteenth Amendments to the U.S. Constitution)**
**(Compelled Speech)**

89.     Plaintiffs incorporate paragraphs 1-88 of this complaint by reference as if fully set forth herein.

90.     The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, prohibits Arizona from compelling "labor

organizations" or collectively bargained benefit plans from making commercial "disclosures" unless they are (a) purely factual, (b) noncontroversial, and (c) not unjustified or unduly burdensome. *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), —— U.S. ——, 138 S.Ct. 2361, 2372 (2018); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

91.    SB 1268, §§23-1421(A)(1)-(3) forces "labor organizations" (and by extension, the benefit plans they collectively bargain) to issue an annual "disclosure" to their members (or to the public, through the labor organization's website) making completely misleading comparisons between the employer contributions made for an individual employee's hours and the benefit plan's "true cost" of providing benefits to that individual. Even worse, SB 1268, §§23-1421(A)(3) requires that an "officer of the labor organization"—including Plaintiff James McLaughlin—sign the compelled disclosure under penalty of perjury, turning Sections (A)(1)-(3) into a criminally backed speech dictate.

92.    SB 1268's compelled "disclosure" is not "purely factual." It mandates the presentation of information that is fundamentally misleading, because employers and unions do not negotiate per-hour employer contribution amounts in order to cover the annual cost of the benefits of the specific individual who works the hours. Costs and risks in Taft-Hartley benefit plans are generally pooled among many employers and many workers. Employer-sponsored plans are not structured or funded on a "per-employee" basis. Health insurance products, for example, are generally self-insured or are purchased for the entire pool of covered workers, not for individual employees. Most pension contributions are set to ensure a defined level of benefits for future retirees. SB 1268 forces Arizona labor organizations to make a comparison that is fundamentally inaccurate.

93.    SB 1268's compelled disclosure is controversial. SB 1268 is based on an assumption that collectively bargained benefit plans are receiving more money in contributions than they pay out in benefits, and that this money should be "returned" to individual employees. Taft-Hartley benefit plans are structured on an understanding that

health, retirement, and other risks can best be addressed through collective, multi-employee solutions. This collective ethos is fundamental to Plaintiff Unions as labor organizations, as well as to the concept of shared risk that is at the heart of all insurance schemes. But SB 1268 seeks to compel regulated labor organizations to inaccurately describe (and structure) their benefits plans in terms of individual risk and individual cost. They effectively force labor organizations to take a position that is fundamentally at odds with their mission.

94. SB 1268's compelled disclosure is also burdensome and entirely unnecessary. Collectively bargained benefit plans are not structured on an individual-contribution/individual-cost basis, so complying with SB 1268's directive would require that these funds completely rework their accounting, administration, and reporting procedures. The disclosure is also unnecessary because benefit plans must already file extensive reports with the United States Secretary of Labor, which unlike SB 1268's "disclosure," correspond to the ways in which such plans are actually structured. ERISA, 29 U.S.C. §§1021(b), 1023(b)(1), 1023(b)(3)(A)-(B), 1024(a). ERISA-governed plans must already provide information on the plan's assets and liabilities, as well as the plan's receipts and disbursements for benefits, to plan participants annually. ERISA, 29 U.S.C. §§1021(a)(2), 1023(b)(3)(A)-(B), 1024(b)(3).

95. For the same reason, the State of Arizona does not have a substantial interest in compelling the Plaintiff Unions to make the "disclosure" that SB 1268 requires. Indeed, the State has no legitimate interest at all in forcing labor organizations to make disclosures of misleading information when comprehensive information is already available and when non-collectively-bargained employer-sponsored plans are not required to make the disclosures.

96. Nor could Arizona meet the higher standard for commercial speech set forth in *Central Hudson v. Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). The interest that the State purportedly is seeking to advance—holding "labor organizations" to "similar" fiduciary standards as employers and "third-party

administrators"—is not substantial, and the SB 1268's compelled disclosure does not directly advance this interest even if it were, because neither employer-sponsored benefit plans that are not collectively bargained nor "third-party administrators" generally are subject to the compelled disclosure that SB 1268 subjects labor organizations to.

97.     Accordingly, SB 1268, §§23-1421(A)(1)-(3) violates the First and Fourteenth Amendments to the United States Constitution.

## SEVENTH CAUSE OF ACTION
**(Ariz. Const. art. 2, § 6)**
**(Compelled Speech)**

98.     Plaintiffs incorporate paragraphs 1-97 of this complaint by reference as if fully set forth herein.

99.     The right to speech under Arizona's Constitution is broader than that under the United States Constitution.   Thus, "a violation of First Amendment principles 'necessarily implies' a violation of the broader protections of article 2, section 6 of the Arizona Constitution."  *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 282, 448 P.3d 890, 903 (2019).   This rule applies to violations of the First Amendment compelled-speech doctrine. *Ibid*.

100.    For the reasons set forth in paragraphs 86-97, above, SB 1268, §§23-1421(A)(1)-(3) violates article 2, section 6 of the Arizona Constitution.

## EIGHTH CAUSE OF ACTION
**(First and Fourteenth Amendments to the U.S. Constitution)**
**(Freedom of Association)**

101.    Plaintiffs incorporate paragraphs 1-100 of this complaint by reference as if fully set forth herein.

102.    "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958).   "[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic,

religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 460–61.

103. Among the rights guaranteed under the First and Fourteenth Amendments is an association's right "to determine its own membership qualifications," *California Democratic Party v. Jones*, 530 U.S. 567, 583 (2000), and its right against state "interfere[nce] with the internal organization or affairs of the group," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

104. SB 1268, §23-1421(A)(8) violates the Plaintiff Unions' associational freedom under the First and Fourteenth Amendments by prohibiting them from "considering" an individual "to be a member of a labor organization" without the individual's "affirmative written consent." The "affirmative written consent" requirement that SB 1268 applies to labor organizations—alone among the many civic, political, economic, religious, and cultural associations that exist in Arizona—is entirely undefined as to standards, content, and frequency. Read on its face, SB 1268 establishes state oversight for all of the activities for which an individual might be "considered a member," including voting in elections and for the ratification of collective bargaining agreements, the right to speak at internal union meetings, obligations to support the labor organization, and much else.

105. By discriminatorily asserting state control over membership criteria and the internal organization and affairs of Arizona's private-sector labor organizations, SB 1268 violates the First and Fourteenth Amendments of the United States Constitution.

### NINTH CAUSE OF ACTION
**(Fourteenth Amendment to the U.S. Constitution, Due Process Clause)**
**(Vagueness)**

106. Plaintiffs incorporate paragraphs 1-105 of this complaint by reference as if fully set forth herein.

107. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "An ordinance may be void for vagueness because either it (1) fails to give a

'person of ordinary intelligence a reasonable opportunity to know what is prohibited;' (2) 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application;' or (3) 'abut(s) upon sensitive areas of basic First Amendment freedoms, [ ] operat[ing] to inhibit the exercise of (those) freedoms.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (quoting *Grayned*, 408 U.S. at 108).

108. SB 1268 violates all three prohibitions animating the Due Process Clause vagueness doctrine, both as to Plaintiff Unions in all of the activities that SB 1268 regulates, and all regulated Arizona labor organizations in their First Amendment activities.

109. SB 1268 appears to have been hastily drafted (without even the most rudimentary proofreading) and subject to minimal or non-existent legal review prior to enactment. Most of its key terms and concepts are undefined and inscrutable, and there are what appear to be typographical errors that redefine the statute's scope from what its authors may have intended. For example, and without limitation:

a. SB 1268, §23-1421(A) does not define the term "labor organization." That term has various definitions in different provisions of state and federal law. *See, e.g.*, Ariz. Rev. Stat. Ann. § 23-1301; LMRDA §3(i), 29 U.S.C. §401(i); NLRA §2(5), 29 U.S.C. §152(5); ERISA, §1002(4) (defining "employee organization"). But SB 1268 appears to use the term "labor organization" in some broader, undefined sense because it assumes that (and, to be operative, is dependent upon) the regulated "labor organization" receiving employer contributions (or, in the statute's terms, "benefit monies", SB 1268, §23-1421(A)), something that labor unions are, in fact, criminally prohibited from doing. 29 U.S.C. §186(a), (b). SB 1268 also presumes that "labor organizations" will "offer benefits" such as health insurance, pensions, and training to "members," something that labor unions do not generally do because they are prohibited from receiving employer contributions for the payment of such benefits.

b. SB 1268, §23-1421(A) does not define what a "member" is. If the term "labor organization" means a "labor union" (as opposed, for example, to a broader

definition encompassing collectively bargained benefit plans that actually receive employer contributions and provide benefits) then the term "member" can mean either one of two things: (a) a "full member" of the union, who pays dues supporting both the costs of representation and the costs of the union's political advocacy; or (b) a so-called "financial core member" who pays only the unions' costs related to representation of the bargaining unit. *Communications Workers of America v. Beck,* 487 U.S. 735, 743 (1988); *United Food & Com. Workers Union, Loc. 1036 v. N.L.R.B.*, 307 F.3d 760, 765 n.5 (9th Cir. 2002). It is also possible that SB 1268's drafters used the term "member" to mean a "member of a represented bargaining unit" (who may, or may not, be a member of the labor union in either sense). This interpretation is possible because SB 1268 uses the terms "member," "employee," and "individual" seemingly interchangeably. It is also possible because there does not seem to be any rational reason for the drafters to have limited SB 1268's benefits disclosure and benefits rights to "members of the union" rather than to all employees covered by a collective bargaining agreement (i.e., "members" of the bargaining unit). But because SB 1268 does not define the term "member," Plaintiffs are left guessing.

      c.    SB 1268, §23-1421(A) is fundamentally vague in holding "labor organization[s] that collect benefit monies or union dues" to "similar fiduciary guidelines as required by employers or third-party administrators providing benefits to employees." This core requirement of SB 1268 is vague in many ways. It is unclear as to what "similar fiduciary duties" are (although it is clear that they are not limited to those set forth in Sections (A)(1)-(8)). Since ERISA's fiduciary duties apply equally to the administration of joint labor-management trust funds and unilateral employer benefit plans (and apply to the "third-party administrators" of either type of plan), SB 1268 is incomprehensible as to the "similar" fiduciary duties it would have "labor organizations" follow. Furthermore, Section (A) states that "labor organizations" are required to follow "similar fiduciary guidelines" as those "required *by* employers or third-party administrators." It may be that SB 1268's drafters intended to use the word "of" rather than "by" in this clause. But

regulated "labor organizations" are left guessing as to whether they are required to follow "similar fiduciary guidelines" as those imposed "by" employers and third-party administrators (whatever those might be) or those "required *of*" employers and third-party administrators.

   d. SB 1268, §23-1421(A)(1)(b) requires a "labor organization" to disclose the "price of each unit collected" but does not define the term further, except to say that it "typically" is an hourly rate for each benefit category based on employee classification. Section (A)(1)(b) does not explain what "price" it is referring to, and the term "price" generally refers to the cost of purchasing something. Nor does Section (A)(1)(b) define what "units" its drafters believe are being "collected" for a particular "price" by a "labor organization" (or by someone else).

   e. SB 1268, §23-1421(A)(1)-(3) also require that "labor organizations" provide the compelled disclosure to their "members' employers." It is unclear which of its members' employers a "labor organization" is required to provide notice to, in the event that the "member" has more than one employer, which is particularly common in the construction industry.

   f. SB 1268, §23-1421(A)(4) mandates that a "labor organization benefit plan"—a term that it does not define—must use generally accepted accounting principles" in the administration of the plan "in a similar method as required by an employer benefit plan," which is also undefined. Since "labor organization benefit plans" may be *joint* labor-management benefit plans (and must be to comply with LMRA §302(c), 29 U.S.C. §186(c)), it is unclear what "labor organization benefit plans" are meant to be or how they differ from "employer benefit plans" (which can also be joint labor-management plans). Section (A)(4) also repeats the drafters apparent error of mandating "similar method[s] as required *by* employer benefit plans" when it is possible that the drafters meant "required *of* employer benefit plans."

   g. SB 1268, §23-1421(A)(5)(a) mandates that a "member" be entitled to choose between benefits "offered by the labor organization" and "benefits from the member's

employer."  Since "benefits offered by the labor organization" and "benefits from the member's employer" are the same thing in the case of joint-labor management plans and may be "offered by a labor organization" in the case of an employer-sponsored plan that is collectively bargained, it is unclear what "benefits from the member's employer" is intended to mean.  For example, it is impossible to know whether this provision confers a right on "members" to demand participation in a unionized employer's separate benefit plan covering non-bargaining-unit managers and executives, even though the "member" does not qualify for those benefits and the employer collectively bargained a different benefit plan to apply to that "member."

h.     SB 1268, §23-1421(A)(7) prohibits a "labor organization" from "accept[ing] dues or benefit contributions" from any employee who has "not voluntarily joined" the "labor organization," but does not define the term "voluntarily joined."  The term is unclear whether it refers to the initial act of "joining" the labor organization only, or whether it also means that such "voluntariness" applies to the ongoing relationship between the employee and the "labor organization."  Nor does SB 1268 define what constitutes "voluntarily" joining—or remaining part of—the labor organization.

i.     SB 1268, §23-1421(A)(8) states that "an individual" "may not be considered to be a member of a labor organization" if the individual does not provide "affirmative written consent."  But this section is entirely unclear as to who is barred from "considering" an individual to be a member of a labor organization (the labor organization itself? the government? fellow members?), or what those regulated are barred from "considering" the individual a member for (voting in union elections? access to government benefits? the admiration and solidarity of fellow workers?).  Nor does SB 1268 define what "affirmative written consent" requires.  Must such consent be provided annually, weekly, daily?  Does it need to be provided each time a labor organization "considers" an individual to be a member?  SB 1268 is unclear.

j.     SB 1268, §23-1421(A)(8) prohibits an individual from "hav[ing] any . . . union benefits withheld from the individual . . . without the individual's affirmative written

consent." It is possible that the drafters intended to state that an individual may not have any "union benefit monies" withheld from them without their consent, but that is not what SB 1268 states. On its face, it seems to prohibit labor organizations, employers, and collectively bargained benefit plans from denying any "individual" any form of union benefits, regardless of whether the "individual" qualifies for them, unless the individual consents. Indeed, by using the term "individual" rather than "member" or "employee," SB 1268 appears to give this right to all individuals (or perhaps all individuals residing in Arizona). Since that would be an absurdity, it seems clear that the drafters meant something else in Section (A)(8), but it is unclear what it is.

k. SB 1268, §23-1421(B) states that SB 1268 does not apply to "labor organizations for employees working for the State, a political subdivision of the State or federal governments [*sic*]." This key provision on the scope of coverage is unclear as to whether SB 1268 applies to a labor organization that represents both public-sector and private-sector employees.

l. SB 1268, §23-1421(C) absolves a "member or employer" of the obligation "to contribute benefit monies for a benefit category as defined in Subsection D, Paragraph 4 or 5 of this Section" (*i.e.* "training" or "other" benefits) or of its obligation to remit dues if a "labor organization" is "*in violation*" of any of SB 1268's substantive provisions. This provision is fundamentally vague as to what "in violation" of SB 1268's substantive provisions means because it does not state who decides whether the labor organization is "in violation" of the provisions (the member or employer? a judicial or administrative tribunal? some other decision maker?).

m. SB 1268, §23-1421(D) is fundamentally vague as to what "benefit categories" (and thus what "benefits") SB 1268 applies to. That Section defines "benefit category" to mean "any combination of one or more of the following *or additional benefit categories*" but states that such benefit categories "may vary for each labor organization." While Section (D) goes on to list some recognizable forms of benefits— "health and welfare," "pension," "vacation, sick or holiday," and "training"—it includes a catch-all

"other" category. The result is a meaningless and fundamentally vague definition with no clear limiting principle.

110. These and other puzzles in SB 1268 fail to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited," or, indeed, who is covered by the law and who its intended beneficiaries are. SB 1268's lack of even minimal clarity on its requirements "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Finally, because SB 1268 implicates fundamental First Amendment speech and expressive association rights, it "abut(s) upon sensitive areas of basic First Amendment freedoms" and does not address those areas with anything close to level of clarity required.

111. For these reasons SB 1268, in its entirety, violates due process under the Fourteenth Amendment to the United States Constitution.

### TENTH CAUSE OF ACTION
### (Ariz. Const. art. 2, § 4)
### (Vagueness)

112. Plaintiffs incorporate paragraphs 1-111 of this complaint by reference as if fully set forth herein.

113. Under Article 2, Section 4 of the Arizona Constitution, a statute is void for vagueness if it does not give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited and fails to contain explicit standards of application to prevent arbitrary and discriminatory enforcement." *State v. Poshka*, 210 Ariz. 218, 220, ¶ 5, 109 P.3d 113, 115 (App. 2005).

114. For the reasons described in paragraphs 105-111, above, SB 1268 is void for vagueness under Article 2, Section 4 of the Arizona Constitution.

### ELEVENTH CAUSE OF ACTION
### (U.S. Constitution, Article I, Section 10, Clause 1)
### (Impairment of Contract)

115. Plaintiffs incorporate paragraphs 1-114 of this complaint by reference as if fully set forth herein.

116. Article I, Section 10, Clause 1 of the United States Constitution prohibits Arizona from adopting any "Law impairing the Obligation of Contracts," thus "restrict[ing] the power of States to disrupt contractual arrangements," *Sveen v. Melin*, 138 S.Ct. 1815, 1821 (2018). A law violates the Impairment of Contracts Clause as to private contracts if it substantially impairs an existing contract and "the State, in justification, [does not have] a significant and legitimate public purpose behind the regulation." *Energy Reserves Group, Inc. v. Kan. Power & Light Co.,* 459 U.S. 400, 411 (1983). Even if a law substantially impairing contracts has a legitimate public purpose, a court must inquire "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.' " *Id.* at 412–13 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

117. Plaintiff Unions are parties to contracts that will be substantially impaired by SB 1268. They are parties to collective bargaining agreements requiring employers to make benefit contributions. Those collective bargaining agreements also contain provisions requiring employers to remit dues to the labor unions pursuant to dues-checkoff arrangements. Plaintiff Unions are also parties to constitutions governing members' qualifications for membership, obligations of membership, and payment of dues, and those constitutions are contracts between Plaintiff Unions and their international bodies. Plaintiff Unions, or their representatives, are also parties to contractual trust agreements governing administration of Taft-Hartley benefit plans. Finally, Plaintiff Unions are beneficiaries of dues-checkoff agreements between employers and union members. All of these contracts will be substantially impaired—indeed, obliterated—by SB 1268.

118. The only stated purpose of SB 1268 is to subject "labor organizations" and collectively bargained benefit plans "to similar fiduciary guidelines as required by [*sic*] employers or third-party administrators providing benefits to employees in the state." SB 1268, §23-1421(A).

119. This purpose is incomprehensible as to SB 1268's impairment of existing collective bargaining agreements and Taft-Hartley trust agreements because a labor organization's benefit plan is the same as a unionized employer's benefit plan, because such benefit plans, including many of Plaintiff Unions' Taft-Hartley benefit plans, are administered by "third party administrators," and because these benefit plans and their "third-party administrators" are already subject to the same fiduciary rules under ERISA.

120. This stated purpose is also incomprehensible and irrational as to SB 1268's impairment of collective bargaining agreements and dues-checkoff authorization agreements providing for the withholding of dues from union members' paychecks and the remission of these dues to Plaintiff Unions because the "similar fiduciary standards" governing "employers or third-party administrators providing benefits to employees"— whatever those may be—have no rational relationship to the fiduciary duties of labor unions in their receipt or handling of union dues.

121. SB 1268 is not supported by a "significant" public purpose because any public purpose that it might fulfill through its various regulations is already being fulfilled by the protections afforded to labor-union members and union-represented workers through the NLRA, RLA, LMRA, LMRDA, and ERISA.

122. Even if SB 1268's purpose was significant and legitimate, which it is not, SB 1268 is not "of a character appropriate to the public purpose justifying the legislation's adoption." If SB 1268's actual purpose is to subject labor organizations and their collectively bargained benefit plans to "similar" fiduciary duties as employers (or "third-party administrators") are when administering benefit plans, ERISA already accomplishes this goal in a far more comprehensive and rational manner. In fact, SB 1268 discriminatorily singles out "labor organizations" for benefit-administration and associational-membership obligations that apply to no other provider of benefits or membership organization in Arizona.

123. Accordingly, SB 1268 unconstitutionally impairs Plaintiff Unions' contracts and is therefore void.

## TWELFTH CAUSE OF ACTION
### (Ariz. Const. art. 2, § 25)
### (Impairment of Contract)

124.    Plaintiffs incorporate paragraphs 1-123 of this complaint by reference as if fully set forth herein.

125.    Article 2, Section 25 of the Arizona Constitution prohibits the Arizona Legislature from enacting any law "impairing the obligation of a contract."

126.    For the reasons set forth in paragraphs 114-123, above, SB 1268 unconstitutionally impairs the obligations of Plaintiff Unions' contracts and is therefore void under Article 2, Section 25 of the Arizona Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1.    For preliminary and permanent injunctions against public enforcement of SB 1268;

2.    For a judicial declaration that SB 1268 (and all provisions and applications of SB 1268 described herein) are unconstitutional;

3.    For an order mandating that Defendants give notice to courts and the public as to these judicial findings of unconstitutionality by publishing notice thereof as part of the Arizona Revised Statutes, if SB 1268 is not immediately repealed;

4.    For Plaintiffs' attorneys' fees and costs herein pursuant to 42 U.S.C. §1988 and any other applicable law; and

5.    For such other and further relief as may be appropriate.

//
//
//
//
//
//
//

RESPECTFULLY SUBMITTED this 10th day of June, 2021.

By: */s/ X. Alex Carpio*
    X. Alex Carpio
    **SNOW, CARPIO & WEEKLEY, PLC**
    55 E Thomas Road, First Floor
    Phoenix, AZ 85012

By: */s/ Paul L. More*
    Paul L. More (*Pro Hac Vice* Application
    Forthcoming)
    Sarah Grossman-Swenson (*Pro Hac Vice*
    Application Forthcoming)
    **MCCRACKEN, STEMERMAN &**
    **HOLSBERRY, LLP**
    595 Market Street, Suite 800
    San Francisco, CA 94105

    *Attorneys for Plaintiffs United Food &*
    *Commercial Workers Local 99, Arizona State*
    *AFL-CIO*, and *James McLaughlin*